CECIL BRUMFIELD, *et al.*, *v.* THE BOARD OF EDUCATION OF
LOGAN COUNTY, *et al.*

(No. 8974)

Submitted October 17, 1939. Decided December 12, 1939.

*W. F. Damron*, for relators.
*T. C. Townsend* and *Ben Moore*, for respondents.

RILEY, JUDGE:

In this original proceeding in mandamus against The Board of Education of Logan County and Paul Winters, its secretary, the relators, Cecil Brumfield and Roy Chambers, a citizen and taxpayer, seek a peremptory writ to declare vacant the office of George Vincen as a member of the board, and to reinstate Brumfield (at times hereinafter referred to as relator) as a member in his stead.

The petition proceeds upon two theories: (1) the meeting at which relator's resignation was tendered and accepted was invalid as having been irregularly convened; and (2) the resignation was induced by intimidation and other specific invalidating circumstances. The petition alleges that Brumfield qualified as a board member on July 6, 1937, and served until January 3, 1939; that Vincen's claimed appointment in lieu of Brumfield was voidable, if not void; that at a regular meeting of the board, Shelton and Louden H. White, assumed their seats under a new term of office at which relator attempted to repudiate his resignation, but was rejected.

A demurrer to the petition was overruled by this Court on August 5, 1939. The respondents answered denying the material allegations of the petition, to which relators replied generally, thus putting in issue two main questions of fact: (1) Was the meeting of January 3, 1939, at which relator tendered his resignation, valid? and (2) if so, did relator tender his resignation because of threats, intimidation or fear of prosecution? Of course, if the first question is answered in the negative, the second question does not properly arise, but if the meeting was valid, it becomes necessary for us to consider the circumstances which led up to the tender of the resignations.

Before discussing the evidence bearing upon the validity of the meeting and the legality of the resignation claimed to have been made by relator, it is well to refer briefly to the circumstances under which the claimed meeting was supposed to be had and the resignations tendered. At the September, 1938 term of the circuit

court, the grand jury returned certain felony and misdemeanor indictments against relator, Shelton and White. Relator and White were indicted for bribery, Shelton for malfeasance in office and all three for the illegal purchase of gasoline from the board. The grand jury, after returning these indictments, recommended that impeachment proceedings be instituted against the three board members under attack. The prosecuting attorney, Claude A. Joyce, testified that, after the return of the indictments, a number of citizens and taxpayers urged him to institute impeachment proceedings in his official capacity; that he at first declined; that after efforts were made to retain an attorney in Logan and Charleston, witness and his law partner, Judge Robert Bland of Logan, were retained and the witness, with the aid of his law partner, prepared a petition for impeachment, which he finally decided to file on January 3rd. The cases arising upon the indictments were set for trial on October 11th and 17, 1938, but were continued by agreement between counsel until the January, 1939 term, at a date after the time contemplated for the filing of the impeachment proceedings.

Pleas in abatement were filed to the various indictments and after the claimed meeting held on January 3, 1939, the issues raised by these pleas in abatement were tried before Judge Charles L. Estep as special Judge, and the indictments quashed on the ground that there was irregularity in the selection of the persons from whose names the jury commissioners selected the grand jury which returned the indictments.

Shortly thereafter, a special grand jury returned similar felony indictments, but the indictments relating to the sale of gasoline were dismissed. The felony case against White was tried at the May, 1939 term and resulted in a verdict of not guilty, and the other case against him was nollied; Brumfield's case, at his request, was continued until the September, 1939 term, and then nollied, and the case against Shelton was nollied at the January term after he had tendered his resignation.

While the second indictment was pending, the relator, at two board meetings held June 28, 1939, and July 3, 1939, attempted to repudiate his resignation, but was refused reinstatement.

In attempting to appraise the evidence bearing upon the two issues before us, we have in mind the oft-repeated rule that essential to the awarding of a writ of mandamus, the one seeking relief must have a clear legal right to the remedy, and there must be a corresponding duty upon the respondent. *Koebert* v. *City of Clarksburg,* 114 W. Va. 406, 171 S. E. 892; *Morton, Sheriff,* v. *Sims, Auditor,* 114 W. Va. 434, 172 S. E. 531; *Wells* v. *State Road Commissioner,* 114 W. Va. 709, 173 S. E. 576; *Master* v. *Morrison, Receiver,* 117 W. Va. 33, 183 S. E. 691.

At the time the resignations were tendered, besides the resignors, the board consisted of J. C. Avis and P. C. Dingess. On the evening of January 2, 1939, the evidence preponderates that all the members, except Shelton, the board president, were present in the room where the board usually met, evidently for the purpose of discussing the matter of the contemplated resignations. Upon the advice of the prosecuting attorney, who was called into the room, to the effect that in the absence of an agreement or formal call, a meeting could not be held in Shelton's absence, the four members then dispersed, with the understanding, according to some witnesses, except the relator, that the members would reconvene on the following evening. About the time of the dispersal, Shelton, who was in Huntington at the time, was called by telephone, at the instance of the superintendent of schools, and urged to return to Logan. As a result of this conversation, and at Shelton's request, he was driven back to Logan. Brumfield testified that on the following evening, January 3, 1939, he, Louden White, Avis and Dingess were present in the board room, together with other persons. Though there is some evidence to the effect that Avis' presence was not noticed, the evidence clearly preponderates to corroborate Brumfield's statement. Even if it did not, a party litigant, though not bound by his own

witness, is bound by his own testimony. Within a short time after these four members had assembled, variously estimated at about twenty or thirty minutes, Shelton came into the room and tendered his resignation. The evidence conflicts as to whether he called the meeting to order and likewise it conflicts as to whether he assumed his usual place in the president's chair at the time the tender was made. Brumfield testified to the effect that Shelton entered from an adjoining room with his coat on his arm, threw his resignation down on the desk and said, "There is my resignation and I hope you fellows are satisfied", and then walked out of the room. The county superintendent, Parsons, evidently was not in the board room when Shelton tendered his resignation. It seems clear, however, from the evidence that prior to the tender, the superintendent had written the resignation which Shelton signed in the adjoining room just immediately before he entered into the board room. The evidence also preponderates to the effect that about the time Shelton thus tendered his resignation and proceeded out of the room, the superintendent entered the room and took his seat at his usual place at the desk. He testified that from that time on until the purported meeting was adjourned, he proceeded to take notes for the purpose of preparing minutes. In this he is corroborated by various witnesses, although there is some evidence to the effect that no notes were taken at the meeting, and his clerk, Pullen, testified that when the minutes were dictated to him by the superintendent on the following morning, the superintendent, contrary to the latter's testimony, had no notes. Be that as it may, Parsons and Avis, the temporary president, testified to the correctness of these minutes.

The minutes, if taken as a verity, show that all members of the board were present; that Shelton tendered his resignation for the balance of his term; that Avis then was elected as temporary president upon motion of Dingess, seconded by Louden H. White; that upon motion of White, seconded by Brumfield, Shelton's resignation

was accepted; that upon White's motion, also seconded by Brumfield, C. L. Williams was elected to fill Shelton's place; that Williams then took the required oath and became a member of the board; that Brumfield then tendered his own resignation, which, upon motion made and seconded, was accepted; and the respondent, George Vincen, was then elected to fill Brumfield's vacancy; and finally, Louden H. White tendered his resignation, which was accepted, and the respondent, Frank White, at the former's request, was appointed in his stead.

This voluminous record fairly teems with charges and counter charges bearing on the facts and circumstances which prompted relator to tender his resignation. At the outset it is well to note that much of the evidence has to do with the conduct of the prosecuting attorney before the grand jury which had returned indictments against relator and two other resignors, of which the record does not disclose that relator had knowledge; and much of the record has to do with testimony concerning threats made to Shelton and Louden H. White and statements made by various parties of which relator was not informed. Evidence of such character, of course, bears little upon the two questions before us.

Brumfield expressed doubt whether he moved the acceptance of Shelton's resignation. In the view that Brumfield himself was unable to state definitely the extent to which he participated in the claimed meeting prior to the tender of his resignation and his withdrawal from the room, and did not positively deny his participation therein, the statements contained in the minutes as to Brumfield's participation are entitled to consideration. It need not be said here that these minutes, under the circumstances of the instant case, are a verity. But verity or not, they should not be overcome by evidence, which contradicts, but does not clearly preponderate, in view of the fact that the relator, if he is to prevail here, must show a clear legal right, which should be determined under Code, 53-1-8, "according to the law and the facts of the case."

Solving the questions of evidence bearing upon the validity of this claimed meeting, in the light of the rule requiring the relator to show a clear legal right, it must be taken as true that after Shelton's arrival all the members of the committee were present, and that, in truth and in fact, Brumfield was present until the time of the tender of his own resignation. And though it is true that under Code, 18-5-4, as amended by Acts, West Virginia Legislature, Ex. Sess., 1933, chapter 8, a special meeting of a board of education may be had upon formal call, it is equally true under the well etsablished law in this state governing boards of education, that where it appears from the minutes, which are a verity, that all the members of a board congregate together, without formal agreement or call, meet and participate in the meeting, they are bound by the proceedings had therein as fully as if they came pursuant to prearrangement or formal call. *Capehart* v. *Board of Education,* 82 W. Va. 217, 220, 95 S. E. 838. *A fortiori* it is also true that where, as here, a member of the board who seeks a peremptory writ of mandamus, actually participates in the meeting according to minutes of the meeting not definitely contradicted by his own testimony, he cannot complain of the actions at the meeting, though the extent of his participation is indefinite. Under these circumstances, the meeting in fact was valid and relator's attempt to resign on that occasion was successful and binding upon him, provided the attempt was made in the absence of any vitiating circumstances such as fraud, intimidation, fear or threats. This necessarily leads us to the second issue in this case.

The question whether or not Brumfield's tender of resignation was made under such circumstances as would indicate a destruction of his free will should, in the main, be restricted to those influences which actually were brought to bear upon him. Of course, it is entirely proper to bear in mind that at the time the tender was made, he and his co-resignors were under indictment for breach of their official duties; that impeachment proceedings against them were impending; that there was a good deal of talk

throughout the community concerning the indictments and threatened proceedings. But common gossip, especially concerning public matters, does not, of itself, amount to coercion, though it may create such a state of mind that a party sought to be coerced may be more easily subjected thereto. In gauging the extent to which Brumfield may have been coerced, his own testimony, together with the evidence in contradiction therewith, looms importantly. He testified generally that he resigned through fear and coercion and that he had been threatened with prosecution and impeachment proceedings. This statement is too general to have much evidentiary value. Coercion must be measured by the facts and circumstances disclosed by the record. Reliance upon this self-serving statement would be somewhat likened to a physician testifying on behalf of a party litigant on the basis of subjective symptoms alone. Though admissible, it is entitled to little weight.

There are, however, parts of Brumfield's testimony which, if uncontradicted, would clearly indicate that he was coerced into tendering his resignation. He testified, in effect, that one Pullen, the county superintendent's clerk, first spoke to him of impeachment proceedings, and told him the prosecuting attorney had asked him how he would like to have some new board members, and said he would bring impeachment proceedings against all three resignors. This testimony is corroborated by the testimony of Pullen himself. He further testified that his superior Sheriff Workman, told him that the prosecuting attorney was going to bring impeachment proceedings against him; that he had better resign; that if he did resign, Workman would have the proceedings delayed; that the circuit court was "packed" against him; that if he did not resign, the impeachment would be tried without a jury; that he had better resign, and that if he did, Workman would look after him.

The relator gave further testimony to the effect that the publication of an article in the Logan Banner on January 3, 1939, had a great effect on him in the tender

of his resignation. This article, headed as it was with glaring headlines, was evidently designed to mold public opinion against the members of the board under attack. The headlines and sub-headlines read in part: "Impeachment proceedings against 3 board members. Prosecutor says he will file petition. Well-founded report indicates officials will resign shortly. R. L. Shelton, Louden White, Cecil Brumfield charged with malfeasance, misconduct, neglect of duty." In the body of the article, the prosecuting attorney, Joyce, is quoted to the effect that he would file impeachment proceedings against the three members on the following day. The article recites that rumors that the three men would resign from their positions have begun to assume the proportions of fact. No where in the article is Joyce or any other person in a responsible or influential position in Logan County quoted as having told relator, in effect, that if these three members would resign either the indictments would be quashed or the impeachment proceedings dropped. The contents of this newspaper article and the fact that it was brought to Brumfield's attention remain in the record uncontradicted. This article, it seems to us, approaches, but does not reach, the proportions of a threat. It does, however, state the facts of the indictment and the impending impeachment proceedings evidently well known to Brumfield which may or may not have prompted him to tender his resignation, depending on whether or not he felt himself guilty or innocent of the charges contained in the indictments and subject to the proceedings which in fact were being prepared by the prosecuting attorney with the assistance of his law partner, Judge Bland, and were impending.

This record, we think, contains evidence that the prosecuting attorney and his law partner under private employment were seeking to bring about the removal of the three members. In fact, Judge Bland, himself, testified that he was called to the superintendent's office where he met Louden H. White and Shelton, relator being absent, and in contradiction of evidence to the effect that he then

and there threatened the two members present with impeachment if they did not resign, he testified that they asked him questions about the probability of sustaining the charges and he stated that he had helped in the preparation of these charges, knew what was in them, and told them "what was against them and some things I had heard that were not in the charges, and said, 'Now, boys, if that is true, it looks pretty bad' * * * and the general conclusion we reached was that they had better resign * * * they, themselves, had reached the conclusion that the court was against them, and that they had better resign, and they rather wanted me to sanction it, as I understood it, and I did." The witness categorically denied that he had ever threatened or coerced any member of the board to resign, and that to his knowledge neither had the prosecuting attorney. On the occasion of the meeting in the superintendent's office, it appears from Judge Bland's testimony that White and Shelton desired that the filing of the charges be delayed until a board meeting could be held so that they could resign.

Workman denied that during the course of the conversation with Brumfield in the sheriff's office, he had advised his deputy to resign. On the contrary, he said that he told Brumfield that he knew what he did, and that witness could not advise him. In this, the sheriff is corroborated by another deputy sheriff, Mullens, who was present in the room during the whole course of the conversation except for two or three minutes. Mullens says that Brumfield had also asked him for advice, which was likewise refused. The prosecuting attorney, Joyce, denied that he had ever coerced Brumfield into resigning, and the record in no particular discloses any discussion between the prosecuting attorney and Brumfield as to the latter's resignation. True, the prosecuting attorney is quoted as having said on several occasions that he intended to impeach Brumfield and the other two members. In reviewing this record, we have noticed that in the main it leans more clearly against Louden H. White and Shelton than against Brumfield. But this is Brumfield's case,

and not that of the other two. It seems that on the question of coercion and intimidation, the evidence, at most, is contradictory, and does not exhibit by a preponderance of the evidence such a clear legal right as would entitle relator to prevail in a mandamus proceeding. But such is not the case, and on this second issue, the evidence is not sufficiently clear as to justify the award of the peremptory writ. Here, again, it must be said that the writ should issue only where the relator has shown a clear legal right thereto, which showing must be based both on the law and the facts of the case. How, then, can we say that a clear legal right has been established where the evidence, as in the instant case, is, at the most contradictory? The record here does not lend itself to such a conclusion.

The fact that a member of a board of education resigns while under indictment for malfeasance in office, or because of fear of impending impeachment proceedings, growing out of the matters upon which the indictment was based, is of itself not such coercion as would vitiate his resignation. Notwithstanding Judge Estep sustained the plea in abatement to the first indictments, the relator was re-indicted by a grand jury whose integrity was not questioned, so far as the present record discloses. If the fear of the pending indictment prompted the resignation, this Court surely, in a case that requires the clear showing of a legal right cannot fathom the many processes of the mind and say that he did not voluntarily do what the record discloses he actually attempted to do, tender his resignation.

In passing, we suggest that, though Joyce's acceptance of private employment to institute the impeachment proceedings was without moral turpitude, it would seem that he, having felt himself justified to proceed under the private employment, should have undertaken the work in his official capacity in the first instance.

The peremptory writ, prayed for, is therefore refused.

*Peremptory writ refused.*